UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| EDWARD VALDEZ, | No. CV 10-02840-VBK |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| v. | (Social Security Case) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits. Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge. The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the Administrative Record ("AR") before the Commissioner. The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified AR.

Plaintiff raises the following issues:

1. Whether the Administrative Law Judge ("ALJ") properly

        evaluated the medical evidence in assessing Plaintiff's residual functional capacity ("RFC"); and

    2. Whether the ALJ properly evaluated Plaintiff's subjective pain complaints.

(JS at 2-3.)

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law. After reviewing the matter, the Court concludes that for the reasons set forth, the decision of the Commissioner must be reversed.

**I**

**THE ALJ ERRED IN FAILING TO DETERMINE THAT NON-EXERTIONAL LIMITATIONS IN PLAINTIFF'S RIGHT UPPER EXTREMITY DID NOT CONSTITUTE A SEVERE IMPAIRMENT**

Plaintiff sustained multiple gunshot wounds in April 2007. (AR 62, 380, 22.) In a progress note made a few weeks after these injuries were sustained, on May 23, 2007, it was reported that Plaintiff complained increasing pain in his right shoulder, and that he was awaiting a call from "LAC/USC."[1]

Following the gunshot wounds, Plaintiff was hospitalized for two weeks. According to a progress note dated April 22, 2008 by the occupational therapist ("OT"), Sherry Shaffer, after being discharged, Plaintiff, who did not have medical insurance, was not followed up by physicians. (AR 298.) In that same report, the OT noted that

---

[1] It would appear that this acronym is a reference to Los Angeles County Hospital, administered by the University of Southern California.

Plaintiff had deficits throughout his right upper extremity secondary to a brachial plexus injury, gunshot wounds, and humerus fracture. It was indicated that Plaintiff would benefit from occupational therapy services "to attempt to [increase] ROM [range of motion] and function of right upper extremity." (Id.)  The OT noted that Plaintiff "has never been followed up for brachial plexus injury nerve damage." (Id.)

A progress note by the OT of May 5, 2008 indicates the extent of damage from a bullet which entered Plaintiff's right medial clavicle and exited his right shoulder.  It was noted that Plaintiff had major brachial plexus injury, and presently experienced pain on a level of 6/10 most of the time and also, Plaintiff had decreased sensation throughout his right upper extremity. (AR 297.)

On June 19, 2008, the OT noted that Plaintiff had continued limitations with range of motion distally in the right upper extremity, with poor fine motor coordination in that area as well as limitations in his gross motor skills.  He had temperature changes in his right upper extremity, with poor tolerance to heat and increasing complaints of pain. (AR 293.)

In reports of July 2, 2008 and July 29, 2008, the OT again noted that Plaintiff had poor fine motor coordination in his right upper extremity, and that pain and numbness decreased his ability to complete daily tasks.  Plaintiff reported an inability to move at times to complete tasks secondary to his pain and numbness. Plaintiff had decreased sensation in his right hand, and his right upper extremity was also affected by heat.  Although Plaintiff made good progress with his occupational therapy overall, he appeared to have decreased strength and coordination "which are not resolving." (AR 285-286, 289.)

1    On September 23, 2008, in a discharge note, the OT indicated that Plaintiff had continued decreased strength and fine motor coordination deficits. Although no limitations were listed when such were requested from a physician, Plaintiff was "encouraged ... to utilize [right upper extremity] as much as tolerated." (AR 280.)

Plaintiff testified that he saw physicians while he was hospitalized after the gunshot wounds at Antelope Valley Hospital. He has had surgeries to his arms. He indicated that he had been doing physical therapy, but had stopped because "they couldn't do anymore [sic] to help me out." He put in paperwork to have physical therapy in March 2008, and stopped in September. He was referred to another physical therapist, but stated "I couldn't do it." At the hearing, the ALJ questioned Plaintiff why he did not start treatment until March of 2008. Plaintiff answered as follows:

"A    Yes, due to the fact we didn't know after I was out of the hospital they, no one really knew how to get help. They didn't know how to get any -- no other doctors were trying to help us. They just let me go and that's that.

Q    Okay. So how did it come to pass that you got the care again?

A    I was in so much pain and my mom started making calls to different places until someone told her where to go to get help."

(AR 383.)

The ALJ did not find that Plaintiff had a severe impairment of any kind from the gunshot wounds. (AR 21, Finding 3.) Thus, the ALJ determined that Plaintiff has the capacity to perform the full range

4

1 of medium work. (Id., Finding 5.)

2 The ALJ fairly well summarized Plaintiff's testimony at the
3 hearing, in the following portion of his decision:

4 "[Plaintiff] testified that he experiences constant
5 pain and numbness in his right arm on a daily basis. He
6 stated that three of his fingers get numb and he has pain
7 from his bicep to his elbow. He testified his pain level
8 everyday is at a 5 and goes up to about a 10 when his body
9 temperature rises. He indicated that on a hot day, or even
10 when he is using his left arm which causes his body
11 temperature to rise, his pain increases to an intolerable
12 level and he starts sweating, shaking, and would have to
13 turn on the air conditioner or use an ice pack to lower his
14 body temperature and relieve some of the pain by [sic]. He
15 also noted that he has to rest his arm in front of his
16 stomach because it causes the least amount of pain and that
17 his doctor advised against wearing a sling so that he does
18 not get used to it. He testified that he is taking
19 medications for treatment which make him a little drowsy and
20 does not make the pain go away.

21 [Plaintiff] testified that he cannot use his right hand
22 or arm at all. He stated that has difficulty holding a cup
23 with his right hand because of the numbness in three of his
24 fingers. He also stated that he has difficulty dressing,
25 bathing, or tying his shoes and requires assistance from his
26 mother or brother. He acknowledged that he is able to use
27 his left arm and hand, but noted that if his body
28 temperature rises from using his left arm, the pain

5

1    increases in his right arm.  He stated that he takes 3 to 5
2    hour naps during the day and does not go out of his house
3    unless he is going to his father's house.  He testified that
4    he can drive a car, but not on hot days.  He also noted that
5    his concentration is affected when the pain is bad because
6    he starts shaking and sweating."
7 (AR 22.)

9    Plaintiff's mother, Martha Ramos, also testified at the hearing,
10 and the ALJ summarized her testimony in the following portion of his
11 decision:

12       "Plaintiff's mother, Martha Ramos, testified that
13    [Plaintiff] can no longer work.  She has seen him in pain,
14    sweating and shaking and would have to turn on the air
15    conditioner for him.  She indicated that [Plaintiff] did not
16    get treatment because they could not afford the doctor, but
17    when his condition worsened, she starting calling different
18    places to get information on where he can get medical
19    treatment.  Ms. Ramos stated that [Plaintiff] does not use
20    his right hand as much and just used it to hold a cup.  She
21    stated that his medication makes him drowsy or is in a haze
22    because when she talks to him she has to check if he is
23    listening and also opined that he his [sic] more irritable.
24    She confirmed that she or [Plaintiff's] brother helps
25    [Plaintiff] get dressed."
26 (AR 23.)

28    At Step Two of the sequential evaluation process, an ALJ must

determine that a severe impairment exists if it (whether alone or in combination with other impairments) significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. §§404.1520(c) and 416.920(c).  The Ninth Circuit has clearly articulated that an impairment or combination of impairments may be found to be not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). Moreover, the Commissioner has stated in Social Security Ruling ("SSR") 85-28 (1985) that "[I]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the non-severe evaluation step." Thus, it is well understood that step two is a "de minimis screening device [used] to dispose of groundless claims," Smolen, 80 F.3d at 1290. An ALJ may only find that a claimant lacks a medically severe impairment or combination of impairments when the conclusion to that effect is "clearly established by medical evidence." SSR 85-28. Further, while a claimant's statements about pain or other symptoms do not alone establish disability, such evidence, in combination with medical signs and laboratory findings demonstrating a medical impairment, is clearly relevant. See 20 C.F.R. §416.929(a)(2010). Where a claimant provides testimony in the form of subjective reporting of pain or other symptoms, and there is no evidence of malingering, such relevant evidence may only be rejected under a "clear and convincing" standard. See Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005), citing Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

It is apparent that Plaintiff did have serious exertional and

7

non-exertional functional limitations in his right upper extremity from the gunshot wound, as evidenced by the progress notes of the OT through September 2008. Indeed, there is no medical evidence to the contrary. The Court thus struggles to understand on what basis the ALJ could possibly have determined that Plaintiff does not have a severe impairment in his right upper extremity as a result of the gunshot wounds. The ALJ does cite a progress note from August 2008 which indicated that Plaintiff had made gains overall, that he experienced decreased numbness from his last reported visit, but that he continued to have pain in his right upper extremity. He did have increased strength and better fine motor coordination in that area. (AR 23, 282.) This progress note, however, is not consistent, overall, with the longitudinal progress reports summarized by the Court. Further, in a progress report of September 23, 2008, which the Court has already summarized, the OT noted that Plaintiff had continued decreased strength and fine motor coordination deficits. (AR 280.) The ALJ also cited signs of reinnervation from an EMG/NCS study on June 19, 2008. (AR 24.) But nerve regeneration is not equivalent to a lack of functional deficits. It appears to the Court that the ALJ selectively cited isolated snippets from the progress notes which effectively misstated the competent evidence in the record in order to justify a conclusion that Plaintiff did not have a severe impairment. This was error. See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984); see also Fiorello v. Heckler, 725 F.2d 174, 176 (2nd Cir. 1983) (the ALJ cannot selectively choose evidence in the record that supports his conclusions); Whitney v. Schweiker, 695 F.2d 784, 788 (9th Cir. 1982)("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.")(citation omitted).

The ALJ also erred in discounting Plaintiff's credibility. Although Plaintiff's testimony at the hearing, which was summarized in the ALJ's decision, and quoted in this decision, and the testimony of his mother were consistent with the progress notes of the OT, nevertheless the ALJ found that Plaintiff's subjective complaints and alleged limitations "are out of proportion to the objective clinical findings as noted above and are not consistent with the treatment he received." (AR 25.)

The ALJ focused in great detail on the fact that Plaintiff had not obtained treatment for his gunshot wounds, for almost a year following his discharge from the hospital in 2007 until approximately April 2008. As viewed by the ALJ, if Plaintiff were indeed experiencing the level of pain and functional limitations to which he testified, he would have sought and obtained treatment. In a lengthy discussion which the Court views as almost entirely speculative, the ALJ asserts that Plaintiff could have "gone to any County clinic for that matter, for information on where he can go for medical treatment ... It would not have taken 1 year after his injury to find medical treatment, even it he initially did not know where he can obtain medical services." (AR 26.)

These negative conclusions were drawn despite the fact that Plaintiff gave an explanation during his testimony at the hearing that he did not know how to get help and that no other doctors were trying to help him. Indeed, the ALJ responded to that testimony by stating, "Okay. So how did it come to pass that you got the care again?" (AR 383.) Plaintiff then responded that he was in so much pain that his mother started making calls to different places until someone told her where to go to get help. (Id.) No inquiry was made by the ALJ as to

whether services were in fact available, or, indeed, if Plaintiff or his mother had the level of sophistication necessary to know how to obtain such services. An equally reasonable conclusion to explain the failure to obtain services might be that the indigent care system simply did not follow through with Plaintiff, and he may not have been assertive enough to know how to work the system to try to get help. This is not just a conclusion that this Court draws, but is consistent with a whole range of case decisions from both this Circuit and other Circuits which hold that if, because of financial limitations, a claimant does not obtain medical services, that cannot be held against the claimant in the disability evaluation process. In the Ninth Circuit, it has been held that "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment [he] cannot obtain for lack of funds." Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995). See also Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988)(while remediable conditions are not generally disabling, that condition is disabling if claimant cannot afford prescribed treatment); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987)("The medicine or treatment an indigent person cannot afford is no more a cure for [his] condition than if it had never been discovered"); Teeter v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985) (inability to afford surgery justifies failure to undergo); Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)("It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because [he] is too poor to obtain medical treatment that may help [him].").

Thus, this matter must be remanded as to both issues raised by Plaintiff. It is unquestionable that Plaintiff does have a severe

impairment for the requisite necessary period of time as to exertional and non-exertional limitations in his right upper extremity. It is also apparent to the Court that the record must be further developed. Plaintiff should be provided with a consultative examination by a qualified medical professional to determine the extent of functional limitations, both exertional and non-exertional, in his right upper extremity.

For the foregoing reasons, this matter will be remanded for further hearing consistent with this Memorandum Opinion.

**IT IS SO ORDERED.**

DATED: February 14, 2011        /s/
                                VICTOR B. KENTON
                                UNITED STATES MAGISTRATE JUDGE